UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

OBERER LAND DEVELOPERS, LTD, *et al.*,

    Plaintiffs,

vs.

SUGARCREEK TOWNSHIP, OHIO, *et al.*,

    Defendants.

Case No. 3:19-cv-82

District Judge Michael J. Newman

---

**ORDER: (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 28); (2) DENYING PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT (DOC. NO. 25); (3) DISMISSING WITH PREJUDICE COUNTS III AND V AND THOSE RELATED PORTIONS OF COUNT VII; (4) DISMISSING WITHOUT PREJUDICE THE STATE-LAW COMPONENT OF COUNT VII; AND (5) TERMINATING THIS CASE ON THE DOCKET**

---

This case is before the Court on the parties' cross motions for summary judgment. Doc. Nos. 25, 28. On March 26, 2020, Judge Rice dismissed with prejudice Plaintiffs' Count I (*Ultra Vires*), Counts II and IV (Due Process Claims), Count VI (42 U.S.C. § 1983 Claim), and portions of Count VII (Declaratory Judgment). *Oberer Land Developers, LTD v. Sugarcreek Twp., Ohio* ("*Oberer I*"), No. 3:19-cv-82, 2020 WL 1466184, at *11 (S.D. Ohio Mar. 26, 2020). The parties now move for summary judgment on Plaintiffs' remaining claims. Doc. Nos. 25, 28. Defendants seek summary judgment against Plaintiffs' Count III (Equal Protection), Count V (Takings Clause), and those portions of Count VII (Declaratory Judgment) related to Counts III and V, while Plaintiffs request summary judgment on the remaining state-law component of their Count VII (Declaratory Judgment). All parties filed opposition memoranda in response to the motions (Doc. Nos. 29, 31) and both sides replied (Doc. Nos. 30, 32). The parties' motions are now ripe for review.

I.

The following facts are undisputed:

Plaintiff Oberer Land Developers, LTD ("Oberer") is no stranger to controversial property development projects. Doc. No. 1 at PageID 3. Oberer served as developer of the so-called Dille/Cornerstone project that spurred years of litigation between the City of Centerville and Defendant Sugarcreek Township, Ohio over whether a municipality could annex land from a township. *Id.* In the present lawsuit, Oberer alleges that members of Defendant Sugarcreek Township, Ohio Board of Trustees ("Board of Trustees") resented Oberer for its role in the previous annexation dispute, and the Board of Trustees allowed that ill-will to influence its decision to deny Oberer's more recent application to rezone certain parcels of land located in Sugarcreek. *Id.* at PageID 3–7.

Part of Sugarcreek's strategy to prevent future annexation was to approach individual owners of undeveloped land with non-annexation agreements. Doc. No. 1 at PageID 3. Landowners who signed a non-annexation agreement promised "not to seek and to oppose any annexation of any portion" of their property for 10 years. Doc. No. 1-1 at PageID 16. With non-annexation agreements in hand, Sugarcreek was less worried about neighboring municipalities luring away landowners with tax incentives. *Oberer I*, 2020 WL 1466184, at *1.

Another prong in Sugarcreek's plan was to improve its development flexibility. Doc. No. 28-1 at PageID 375. In 2013, Sugarcreek introduced its Long-Range Land Use Plan ("LRLUP") designed to promote property development consistent with the community's long-standing rural character. *Id.* The LRLUP established two development zones relevant to this litigation: Planning Area 1 and Planning Area 3. *Id.* at PageID 378–81. Planning Area 1 covers areas both east and west of highway I-675 and north of the City of Bellbrook. *Id.* at PageID 378. At the time, about 37.4% of Planning Area 1 was devoted to single-family residential housing, 38.4% was

agricultural or undeveloped land, and 11.4% was devoted to parks and recreational space. *Id.* Planning Area 3 had comparably less single-family housing (11.2%) and undeveloped land (18%), but, because the Sugarcreek Reserve Metropark occupies most of Planning Area 3, it included far more park and recreation space (69.9%). *Id.* at PageID 380. Both zones are considered "priority area[s] for conservation subdivisions characterized by clustering of lots to preserve 50 percent or more of a site." *Id.* at PageID 378, 380.

Plaintiff Peter Rammel owns approximately 107.383 acres of land in Planning Area 3 ("Rammel Farm"). Doc. No. 1 at PageID 2. Rammel Farm is bordered by Sugarcreek Reserve Metropark, Wilmington-Dayton Road, and Conference Road to the north and Bill Yeck park to the west. Doc. No. 28-1 at PageID 382–83. To the east and west are single-family home development sites. *Id.* Rammel Farm is vulnerable to annexation, so Sugarcreek offered Rammel, and he signed, a non-annexation agreement. Doc. No. 1-2 at PageID 16.

Oberer approached Rammel with an offer to buy his property in 2017. Doc. No. 1 at PageID 4. Oberer hoped to build 113 single family homes on Rammel Farm. Doc. No. 28-1 at PageID 382. To do so, Oberer needed to convince the Sugarcreek Township Board of Zoning Commission ("BZC") and the Board of Trustees to approve its application to rezone Rammel Farm from E-Rural Estate Residential District to Residential Planned Unit Conservation Development District (R-PUCD). Doc. No. 28-1 at PageID 398–408, 441–45, 451–54.

Oberer was the first developer in Sugarcreek to attempt an R-PUCD since that type of district was modified. Doc. No. 28-1 at PageID 355, 453. R-PUCD developments must set aside 50% or more of the total project area for "open space" as defined by the zoning resolution. *Id.* at PageID 367. Applicants -- as Oberer attempted to do here -- can satisfy the open space requirement through a conservation easement that specifically describes how the open space will be maintained.

3

*Id.* at PageID 368.  The BZC and Board of Trustees must find that a conservation easement meets the open space requirement before approving the zoning application.  *Id.* at PageID 386.

Oberer first had to obtain approval from the Greene County Regional Planning and Coordinating Commission ("GCRPCC"), which was tasked with making a recommendation on the zoning application to the BZC.  Doc. No. 5-2 at PageID 49.  Rammel Farm is only accessible from the north through a 90-degree intersection at the corner of Wilmington-Dayton and Conference Roads that Greene County had long hoped to eliminate.  Doc. No. 28-1 at PageID 383.  Oberer initially proposed constructing a traffic signal at the intersection, but Sugarcreek Trustee Michael Pittman, who was then a member of the GCRPCC, convinced the GCRPCC to require Oberer to remediate three intersections and realign Wilmington-Dayton Road south through Rammel Farm.  Doc. No. 5-2 at PageID 73.  Oberer agreed to do so, even though that meant scaling its development back to 98 lots.  *Id.* at PageID 61, 71; Doc. No. 5-3 at PageID 83, 89.  The GCRPCC recommended that the BZC approve Oberer's revised plan so long as Oberer committed to repairing the nearby roadways.  Doc. No. 5-2 at PageID 68–69.

Approximately 130 concerned citizens turned out for the BZC's consideration of Oberer's zoning application.  Doc. No. 28-1 at PageID 398.  BZC Chairperson Doug Betz pointed out that Rammel Farm was one of Sugarcreek's most susceptible parcels to annexation.  *Id.* at 406.  But, because Rammel signed a non-annexation agreement, Betz "fel[t] a little different about this parcel . . . versus . . . other[s]" in Sugarcreek."  *Id.*  The BZC unanimously voted down Oberer's proposal.  *Id.* at PageID 407.

Oberer met similar resistance from the Board of Trustees.  *Id.* at PageID 441, 451.  Pittman was among the most vocal opponents of the application.  *Id.* at PageID 453.  He believed the proposed development fell short in several of the LRLUP's areas of emphasis -- including a "sense

4

of community" and little detail on how Oberer planned to use the open space. *Id.* Pittman observed a "development [has never] had this much input from citizens," and, while he intended to vote down the project, "he did not want to see this door shut." *Id.* Trustee Carolyn Destefani noted that Oberer was the first developer to attempt a conservation easement, and, in her view, its proposal failed to satisfy the open space requirements. *Id.* Destefani believed the zoning resolution required hills and open space between houses, not all the units clustered on one half of the property like Oberer proposed. *Id.* The Board of Trustees unanimously denied Oberer's application. *Id.*

Oberer and Rammel (collectively, "Plaintiffs") promptly filed a seven-count complaint against Sugarcreek. Doc. No. 1. The parties now respectively move for summary judgment on Plaintiffs' Count III (Equal Protection), Count V (Takings), and Count VII (Declaratory Judgment). Doc. Nos. 25, 28. The Court will review each motion in turn.

## II.

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323; *Lansing Dairy. Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). The moving party must either point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *See* Fed. R. Civ. P. 56(c)(1)(A), (B). A court considering a motion

5

for summary judgment must view the facts and all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

If the moving party meets its burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Id.* "[T]he party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). "The failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion." *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009). "Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander*, 576 F.3d at 558.

### III.

Plaintiffs allege that the Board of Trustees denied Oberer's zoning application in violation of the Fourteenth Amendment's Equal Protection Clause. Doc. No. 1 at PageID 9. The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. A state action violates the Equal Protection clause if it (1) "burden[s] a fundamental right"; (2) "target[s] a suspect class"; or (3) "intentionally treat[s] one [individual] differently from others similarly situated without any rational basis." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005). Violations of the third kind must be proven on the so-called "class of one" theory. *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty., Ohio*, 430 F.3d 783, 788 (6th Cir. 2005).

To prevail on a class-of-one theory, the plaintiff must show the state (1) treated the plaintiff differently than a similarly situated individual and (2) had no rational basis for doing so. *Warren*

6

*v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005). A class-of-one plaintiff must demonstrate that the government action lacks a rational basis by either "negating every conceivable" explanation for the conduct or by showing the challenged action was "motivated by animus or ill-will." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 865 (6th Cir. 2012) (cleaned up). Courts view class-of-one claims "skeptically because such claims have the potential to turn into an exercise in which juries are second-guessing the legislative process." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 461 (6th Cir. 2012).

Plaintiffs here fail to carry their "heavy burden" to prove a class-of-one claim. *Id.* at 462. They draw a comparison between Rammel Farm and two other Oberer developments -- Black Farm and Woodland Ridge -- whose zoning applications were approved by the Board of Trustees. Doc. No. 31 at PageID 523. But, beyond the fact that all three properties were regulated by the LRLUP, Plaintiffs do not show through affidavits, deposition testimony, or otherwise why these properties are materially similar. *Id.* at PageID 523–26. Plaintiffs' opposition to summary judgment on their Count III consists of conclusory assertions unsupported by the record. *See, e.g., Liberty Lobby, Inc.*, 477 U.S. at 249–50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted") (citations omitted).

### A. Similarly Situated

Plaintiffs "have the burden of demonstrating that they were treated differently than other property owners who were similarly situated in *all material respects*." *Loesel*, 692 F.3d at 462 (emphasis in original). "In determining whether individuals are 'similarly situated,' a court should 'not demand exact correlation, but should instead seek relevant similarity.'" *Bench Billboard v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012) (quoting *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000)) (citation omitted). "[M]ateriality cannot be evaluated in a vacuum." *TriHealth*, 430 F.3d at 790.

7

Black Farm and Woodland Ridge are two completed residential subdivisions north of the City of Bellbrook. Doc. No. 1 at PageID 5; Doc. No. 31 at PageID 523. Both developments are located in Planning Area 1. Doc. No. 28-1 at PageID 354, 378. The BZC and Board of Trustees approved Oberer's application to rezone both parcels from A-1 (Agriculture) to Residential Planned Unit Development (PUD-R). *Id.* at 354, 467, 475.

Defendants advance several reasons why the three properties are not similarly situated. Doc. No. 28 at PageID 339–41. Their principal rationale is that Planning Area 1 has a different development pattern than Planning Area 3. *Id.* at PageID 340. Defendants were more focused on expanding residential housing in Planning Area 1 because most of that development area has sufficient water and sewer access; whereas, Planning Area 3 has access to water service but only "limited access to sewer service." *Id.* Better utility access means units can be built closer together, which is why, in Defendant's view, Planning Area 1's most common development type is single family homes on less than 1 acre. *Id.*; Doc. No. 28-1 at PageID 378. Defendants explain that this is a primary reason a development south of the City of Bellbrook has not been approved for over 15 years. Doc. No. 28 at PageID 341.

Defendants also argue that the area surrounding the respective developments is distinguishable. *Id.* at 340–41. Rammel Farm is bordered by Sugarcreek Metropark to the north and large, estate style housing to the south. Doc. No. 28-1 at PageID 382–83. Black Farm and Woodland Ridge are located in a more suburban setting and are adjacent to several residential subdivisions and a large church. Doc. No. 28 at PageID 340–41. Defendants insist that Rammel Farm's rural characteristics introduced different planning considerations compared to Black Farm and Woodland Ridge. *Id.*

Plaintiffs dismiss Defendants' distinctions as immaterial and believe what matters is that all three developments were subject to similar LRLUP requirements. Doc. No. 31 at PageID 524. Both Planning Area 1 and 3 were identified as "priority areas" for residential development and required that new subdivisions satisfy the open space condition. *Id.* Plaintiffs also point out that Rammel Farm is located near more residential subdivisions than Defendants admit. *Id.* at 524–25.

But Plaintiffs offer little in the way of specific comparisons between the property on which Black Farm and Woodland Ridge were built versus Rammel Farm. *Id.* at PageID 523–25; *see, e.g.*, *Loesel*, 692 F.3d at 463 ("The relevant question [in the similarly situated analysis] should be framed in terms of the properties and their owners, not in terms of the stores located on those properties"). One concern cited by both the BZC and Board of Trustees when reviewing the Rammel Farm application was the realignment and remediation of nearby roadways and intersections. Doc. No. 28-1 at PageID 398–408, 441–53. Two trustees found traffic concerns relevant to their decision. *Id.* at PageID 453.

Plaintiffs provide no indication -- through deposition testimony, affidavits, or otherwise -- that Black Farm and Woodland Ridge faced similar traffic difficulties. Doc. No. 31 at PageID 523–25. Minutes from the Board of Trustee meetings where the two comparator subdivisions were approved indicate that Oberer was required to complete a traffic study as a condition of approval. Doc. No. 28-1 at PageID 467–68, 475. Defendants point out that the traffic impact of the respective developments impacted each decision. Doc. No. 28 at PageID 339. Yet Plaintiffs put forward no evidence tending to show the traffic issues posed by each development were at least comparable. Doc. No. 31 at PageID 523–25.

The undisputed record also shows there is a material difference between land located in Planning Area 1 versus Planning Area 3. Doc. No. 28-1 at PageID 378–81. Planning Area 1 is

marked by far more single-family housing (especially of the type built on Black Farm and Woodland Ridge) than Planning Area 3. *Id.* at PageID 378. At the time the LRLUP was written, Planning Area 1 had much more potential development area (846 acres) compared to Planning Area 3 (146.2 acres). *Id.* at PageID 377. It is no surprise, then, that numerous concerned citizens protested the development of Rammel Farm, and both the BZC and Board of Trustees exhibited caution in deciding how to use scarce developable land. *Id.* at PageID 398–408, 441–53.

Plaintiffs emphasize that both zones were priority areas for conservation developments. *Id.* at PageID 378, 380. But this was a development guideline set forth in the LRLUP, not an indicator of a concerted push to build more conservation subdivisions. *Id.* In other words, if the Board of Trustees were to approve a new development, the LRLUP recommends it satisfy an open space requirement. *Id.* How a development proposal uses open space, or any development criteria, for that matter, has no bearing on whether the properties identified by Plaintiffs share sufficiently similar characteristics. *Id.*

Plaintiffs also allege that Defendants treated Rammel differently because he signed a non-annexation agreement. Doc. No. 31 at PageID 525–56. They believe that property owners who did not sign such an agreement receive more favorable treatment from the BZC and Board of Trustees. *Id.* Though BZC Chairman Betz referenced the fact that Rammel signed a non-annexation agreement, that fact alone does not tend to show Defendants treated Rammel any differently than landowners who did not sign non-annexation agreements. Doc. No. 28-1 at PageID 406. Instead, it suggests that Defendants had little urgency to approve Oberer's application because Rammel Farm could not be annexed. *Id.* But Plaintiffs presented no evidence showing -- or conducted discovery on -- whether other non-annexation agreement holders or those landowners whose properties were not an annexation risk were treated differently.

In sum, no reasonable jury could find Rammel Farm is similarly situated to Black Farm or Woodland Ridge.  Nor is there a genuine dispute of material fact concerning whether Rammel is similarly situated to other landowners, whether or not they signed a non-annexation agreement.

**B.** **Rational Basis**

Even had Plaintiffs shown they were similarly situated to other developments or property owners, their rational basis arguments still fail as a matter of law.  "The rational basis test turns upon the rationality of state action, not upon whether it was wise or effective policy."  *Systemic Recycling LLC v. City of Detroit*, 635 F. App'x 175, 181 (6th Cir. 2015) (cleaned up).  "[G]overnmental action subject to equal protection scrutiny under the rational basis test must be sustained if *any* conceivable basis rationally supports it."  *TriHealth*, 430 F.3d at 790 (emphasis in original).  Defendants have "no obligation to produce evidence to sustain the rationality of [their] action; [their] choice is presumptively valid and 'may be based on rational speculation unsupported by evidence or empirical data.'"  *Id.* (quoting *FCC v. Beach Commc'ns., Inc.*, 508 U.S. 307, 315 (1993)).

Plaintiffs argue that Defendants' decision was driven by animus, and they point to comments made by Pittman and Defendants' supposed general dislike of Oberer to show it.  Doc. No. 31 at PageID 528–29.  Specifically, Pittman, prior to the GCRPCC meeting, cast Sugarcreek as "confronted with a developer [*i.e.*, Oberer] who wants to create lots in the southern part of the township."  Doc. No. 5-2 at PageID 61.  Pittman, at the same meeting, lamented the non-annexation campaign as something Sugarcreek was "forced to do."  *Id.*  From those statements, Plaintiffs infer that Pittman was referring to Oberer's role in the Dille/Cornerstone development.  Doc. No. 31 at PageID 528–29.

Defendants contend this inference is not evidenced in the record.  Doc. No. 32 at PageID 545.  The Court agrees.  Nowhere in the GCRPCC, BZC, or Board of Trustees meeting minutes is

11

there a reference to the Dille/Cornerstone project. *Id.* Defendants also emphasize that Pittman -- during the Board of Trustees meeting -- said "he did not want to see this door shut" and Destefani observed that there was "no reason why the township and developer cannot work further to possibly make this happen." Doc. No. 28-1 at PageID 453.

Judge Rice found Plaintiffs' allegation -- that Defendants' decision was motivated, at least in part, by Oberer's role in the Dille/Cornerstone development -- was sufficient to demonstrate a *plausible* Equal Protection Clause Claim. *Oberer I*, 2020 WL 1466184, at *8. Plaintiffs then had the opportunity to sustain that allegation through facts obtained through discovery. *Id.* at *9. Plaintiffs, however, failed to do so.

In their opposition briefing, Plaintiffs argue that their allegation of animus alone is enough to show a genuine dispute of material fact. Doc. No. 31 at PageID 527–29. But, to survive summary judgment, Plaintiffs must go beyond the pleadings to demonstrate that a reasonable jury could believe their version of events. *See, e.g.*, *Alexander*, 576 F.3d at 558 ("[T]he party opposing summary judgment must show that she *can* make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary") (emphasis omitted). Plaintiffs produced no deposition testimony or affidavits from anyone associated with the Rammel Farm application who could speak to the motivations of the Board of Trustees. Doc. No. 31 at PageID 527–29. No credible evidence in the record contradicts Defendants' argument that the Board of Trustees denied Oberer's application with legitimate considerations in mind. Doc. No. 32 at PageID 545–46. Summary judgment on Plaintiffs' Count III and that portion of Count VII relating to their Equal Protection Clause claim is, therefore, warranted.

### IV.

Plaintiffs' Count V alleges Defendants violated the Fifth Amendment's Takings Clause. Doc. No. 1 at PageID 11. A state violates the Takings Clause by taking private property "without just compensation" in one of two ways. *Cedar Point Nursery v. Hassid*, __ U.S. __, 141 S. Ct. 2063, 2071 (2021). A *per se* taking occurs when the government physically seizes property or directly appropriates it. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005). A regulatory taking results when government regulation of private property becomes so onerous that it amounts to a taking. *Cedar Point Nursery*, 141 S. Ct. at 2072. A taking might occur if government regulation causes a deprivation of "*all* economically beneficial use[]." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992) (emphasis in original). Or, "if regulation goes too far" so as to become "burdensome," it will be considered a taking. *Murr v. Wisconsin*, __ U.S. __, 137 S. Ct. 1933, 1942 (2017) (quotation omitted). Courts balance the following factors to assess whether government regulation effects an unconstitutional taking: (1) "the economic impact of the regulation on the claimant"; (2) the extent of the regulation's interference with "investment-backed expectations"; and (3) "the character of the government action." *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978).

Plaintiffs do not allege a *per se* taking and thus must present a triable regulatory taking claim. Doc. No. 31 at PageID 529. Plaintiffs commissioned an expert report to assess the financial feasibility of developing Rammel Farm as it is currently zoned. Doc. No. 28-2 at PageID 485. The report determined that, under current zoning conditions, Rammel Farm could be subdivided into 15 or 17 residential lots depending on whether roadway improvements are made. *Id.* at PageID 488. Oberer, the report found, would lose roughly $60,000 under the 15-lot scenario and $900,000 with 17 lots, most of which would be expended straightening Wilmington-Dayton Road. *Id.* at PageID 493–94. If the property was sold undeveloped as recreation space, the report valued it at

13

$564,000. *Id.* at PageID 494. Plaintiffs contend this report shows that, by not granting their zoning application, Defendants denied them all economically beneficial use of their property. Doc. No. 31 at PageID 529.

This argument, however, conflates what counts as economically beneficial use with the highest-and-best use of property. Doc. 28-2 at PageID 485 (identifying a residential subdivision as the highest-and-best use of Rammel Farm); *see Loreto Dev. Co., Inc. v. Village of Chardon, Ohio*, Nos. 97-3502, 97-3656, 1998 WL 320981, at *4 (6th Cir. June 4, 1998) ("A taking does not occur just because the owner is denied the highest and best use of the property"). To show that government regulation destroyed *all* economically beneficial use of property, a claimant must show that the regulation "pressed [the land] into some form of public service under the guise of mitigating serious public harm." *Lucas*, 505 U.S. at 1018. A taking of this type would be equivalent to the state buying the land to create, for example, a nature preserve, which would necessitate compensation. *Id.* at 1019.

Plaintiffs here had more options than they let on. Two trustees suggested, while explaining why they voted down the zoning application, that they were open to revisiting the proposal if Oberer better explained how it planned to satisfy the open space requirement. Doc. No. 28-1 at PageID 453. Had Plaintiffs taken up that invitation, their application may have been approved. *Id.* Or they could have sold the undeveloped land to another developer willing to meet the BZC and Board of Trustees' requirements. Doc. No. 28-2 at PageID 494. This is not a case where Plaintiffs' only choice was to essentially forfeit their land to the state. *See Lucas*, 505 U.S. at 1018–19.

Consideration of the *Penn Central* factors does not yield a different result. Oberer, by making its contract with Rammel contingent on securing a zoning change, understood it was taking

14

a risk to develop the property. Doc. No. 1 at PageID 4. Although Oberer may not have been able to build all the housing it hoped for, Plaintiffs do not dispute that at least some of the land can be developed. Doc. No. 28-2 at PageID 488. While Defendants' decision decreased the value of Rammel Farm, courts have found that diminution in value alone does not constitute a regulatory taking. *See, e.g.*, *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 456 (6th Cir. 2009) ("[D]iminution in the value of property or other financial injury because of regulatory action by itself does not generally constitute a taking"). The Fifth Amendment does not compel local governments "to pay compensation to every frustrated developer that had hoped to maximize its bottom line." *Pulte Home Corp. v. Montgomery Cnty., Md.*, 909 F.3d 685, 696 (4th Cir. 2018). Summary judgment on Plaintiffs' Count V and that portion of Count VII relating to Count V is therefore appropriate.

## V.

Plaintiffs' remaining claim (Count VII) is an effort to invalidate the non-annexation agreement between Rammel and Sugarcreek. Doc. No. 1 at PageID 12. Plaintiffs argue that, under Ohio statutory law, neither Sugarcreek, as a township, nor its administrator, in his capacity as a township representative, had the power to enter a non-annexation agreement. Doc. No. 25 at PageID 326–28. A declaratory judgment voiding the non-annexation agreement would, presumably, unencumber Rammel Farm to be annexed by the City of Centerville. *Id.*

The Court has supplemental jurisdiction over Plaintiffs' state law claim by virtue of its original jurisdiction over their federal law claims. 28 U.S.C. § 1331; 28 U.S.C. § 1367(a). Where -- as is the case here -- summary judgment dismissal of a party's federal law claims is warranted, the Court may decline to exercise supplemental jurisdiction over any remaining state law claims. *See Packard v. Farmers Ins. Co. of Columbus, Inc.*, 423 F. App'x 580, 585 (6th Cir. 2011) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to

dismissing the state law claims, or remanding them to state court if the action was removed") (quoting *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996)). "Comity to state courts" is the principal motivation in a decision to dismiss state law claims "to avoid needless decisions of state law." *Id.* at 584; *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 522 (6th Cir. 2007). Jurisdiction over state law claims should only be retained if considerations of "convenience, comity, fairness, and judicial economy" outweigh the presumption that state courts should decide state issues. *Fox v. Brown Mem'l Home, Inc.*, 761 F. Supp. 2d 718, 724–25 (S.D. Ohio 2011); *see also Packard*, 423 F. App'x at 584 ("[T]his Court applies a strong presumption against the exercise of supplemental jurisdiction once federal claims have been dismissed").

Plaintiffs invite the Court to circumscribe Sugarcreek's authority and, by implication, weigh in on how Sugarcreek has chosen to pursue its development strategy. Doc. No. 30 at PageID 509. The Court declines to do so. Both comity and efficiency counsel against reaching the merits of Plaintiffs' state law claim. *See, e.g.*, *Fox*, 761 F. Supp. 2d at 725–26 (declining to exercise supplemental jurisdiction over state law claim where the court had made only one substantive ruling related to the claim and a merits decision would require wading into an unsettled area of state law).

## VI.

For the foregoing reasons, the Court (1) **GRANTS** Defendants' motion for summary judgment (Doc. No. 28); (2) **DENIES** Plaintiffs' motion for summary judgment (Doc. No. 25); (3) **DISMISSES WITH PREJUDICE** Plaintiffs' Counts III and V and those related portions of Count VII; (4) **DISMISSES WITHOUT PREJUDICE** the state-law component of Plaintiffs' Count VII; and (5) **TERMINATES** this case on the docket.

**IT IS SO ORDERED.**

16

Date:  August 30, 2021                             s/Michael J. Newman
                                                   Hon. Michael J. Newman
                                                   United States District Judge